UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASIM ALTAMIMI,<br><br>Plaintiff,<br><br>v.<br><br>PETROLEO BRASILEIRO S.A. – PETROBRAS; and PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES,<br><br>Defendants. | No. 1:16-cv-2686<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Asim Altamimi ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of public documents, conference calls and announcements issued by Petroleo Brasileiro S.A. - Petrobras ("Petrobras" or the "Company") and its subsidiaries, wire and press releases published by and regarding the Company, advisories about the Company, and other information obtainable in the public domain. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein and will be further revealed after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This litigation arises from Plaintiff's purchases of Petrobras American Depository Receipts ("ADRs") on the New York Stock Exchange ("NYSE"). Plaintiff purchased his shares between 2011 and 2015 (the "Relevant Period") and has significant damages directly stemming from those purchases.

2. Petrobras, through its officers and employees, engaged in one of the largest bribery and accounting scandals of the 21st century. The total dollar value of the fraud measures well into the billions and dozens of executives, directors, contractors and politicians have been implicated by the revelations, many of which have been prosecuted and jailed. In order to con investors on this massive scale, active participation by high-level Petrobras executives was essential and the fraud infested all levels of the Company.

3. The scheme became the subject of an ongoing Brazilian federal police investigation, opened in 2009, referred to as "Lava Jato," which translates as "Car Wash."[1] Brazil's Supreme Court has authorized the investigation of approximately 50 current or former members of its Congress with relation to Lava Jato, including no fewer than 12 senators, 22 congressmen, the President of its Senate, the Speaker of its lower house and Brazil's former Presidents, Fernando Collor de Mello and Luiz Inacio Lula da Silva. Executives have been arrested, jailed and had their assets frozen. For the first time in the history of the modern government of Brazil, a sitting senator was arrested on corruption charges related to his public service.

4. At its heart, the Petrobras fraud was a kickback scheme on a monumental scale. Dating back to at least 2004, the Company spawned a scheme whereby it would place its largest capital projects out to bid to a favored group of contractors, aptly referred to as "the Cartel." Insiders at the Company were privy to the internal estimates of what the projects were expected to cost, and Petrobras policy allowed the selection of bids at up to twenty percent (20%) over the

[1] The terms "Car Wash" and "Lava Jato" are used interchangeably throughout. All translations from Portuguese, including translated quotes, have been made as accurately as reasonably possible.

actual expected costs if there were no lower bids.[2] Corrupt Company insiders would relay confidential information regarding the anticipated costs to the Cartel. The Cartel contracting firms would then meet and decide which construction company was going to 'win' the bid, and that company would submit a bid for an amount equal to the anticipated cost, plus the full 20% markup. The other members of the Cartel, by agreement, would submit bids wildly in excess of the cost-plus-20% mark, with the understanding that other Cartel members would do the same when it was their respective turn to 'win' a bid. In exchange for providing Cartel members with information about the absolute maximum that Petrobras was willing to pay for any given project, executives would receive a kickback calculated as a set percentage, typically three percent (3%), of the total contract value. The executives and directors who received the kickbacks would then distribute the proceeds throughout the Company and to the Brazilian government officials responsible for appointing Petrobras' most senior management.

5. These overpayments infested all aspects of Petrobras' spending, from inflated rig contracts to the overpayment of acquisitions such as refineries. Petrobras and its most senior executives were at all times active participants in the bidding scheme designed to prevent any genuinely competitive bids for the Company's largest projects, ensuring that only bidders willing to dole out bribes to Petrobras' executives and other officials were awarded contracts.

6. Because the Company was undergoing the largest expansion in its history, driven by booming oil prices, technological developments allowing more inaccessible natural resources to be harvested and new oil discoveries in Brazil and Brazilian-controlled offshore areas, the opportunities for graft and over-inflation of expenses were abundant. According to a NEW YORK TIMES article, from 2011 to 2014 alone, $444 million was moved, in over 3,500 transactions by a

---

[2] If a project did not result in any bids below the anticipated cost plus the 20%, the project would either be re-bid or temporarily delayed.

single individual. Another participant, referred to as the "money mule," took hundreds of flights with up to €500,000 strapped to his body, to be distributed as illegal kickbacks.

7. To conceal the fraud, Petrobras made material misstatements in its financial statements capitalizing the corrupt overpayments as assets—booked under Property, Plants & Equipment ("PP&E")—rather than as expenses. This is (and was) a clear violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS") and caused Petrobras to understate its expenses and overstate both its net income and the value of its assets. Petrobras has since admitted that overpayments were "*improperly recognized as part of the costs of our fixed assets*" rather than as expenses. In April 2015, Petrobras announced a *$17 billion write-down* and impairment charge as a consequence of these misstatements.

8. Despite the epic scale of the scandal, it operated for years undetected by authorities and unknown to investors, both of which finally began to change after nearly a decade of kickbacks. Indeed, even as the truth slowly began to emerge, Petrobras continued to hide many of the relevant and material facts. On March 20, 2014, the former head of Petrobras' refining and supply department, Paulo Roberto Costa ("Costa"), was arrested by police after an investigation—at that time unrelated to Petrobras—had caught him receiving a bribe from a known and convicted money launderer. This act caused the Company to come under the scrutiny of Brazilian authorities.

9. Thereafter, beginning in September 2014, the public slowly began to learn of the scheme. The Brazilian magazine *Veja*, reported on the kickbacks and inflated contracts, as conveyed to police investigators from Costa, Petrobras' former Chief Downstream Officer. Because of his connections to a known money launderer already under investigation by Brazilian

police, Costa himself became a subject of interest to the investigating authorities, and through that focus, placed Petrobras under the microscope of government interest. Disclosures have steadily streamed forth over the past eighteen months since the *Veja* article was published, setting forth the nature of the fraud perpetrated upon investors by the Company. These revelations have cost Plaintiff millions of dollars.

10. Although investors had no knowledge of the wrongdoing at the time, Petrobras has since admitted to the fraud. On April 23, 2015, the Company filed a Form 6-K with the SEC setting forth, in broad terms, the shocking nature of the fraud occurring at Petrobras, with the support of key executives and directors, each of whom personally profited tremendously by the scheme. In the filing, the Company acknowledged that the corruption involved a group of 27 companies (*i.e.*, the Cartel) that, between 2004 and April 2012, "*colluded to obtain contracts with Petrobras, overcharge the Company under those contracts and use the overpayment received under the contracts to fund improper payments to political parties, elected officials or other public officials, individual contractor personnel, the former Petrobras personnel and other individuals involved in the scheme*." The corruption was so pervasive that the Company was forced to assume it affected every single contract with the Cartel during that period.

11. Petrobras' scheme could not have been possible without a grossly negligent abdication of professional duties by its auditor, PricewaterhouseCoopers Auditores Independentes ("PWC" and with Petrobras, "Defendants"). PWC failed to perform reasonably competent audits of the Company's key assets, and ignored multiple red flags. It issued opinions assuring investors (including Plaintiff) that the Company's internal controls and financial reporting practices were strong and that the Company's financial statements complied with IFRS and fairly and accurately presented the Company's financial condition and the results of its

operations. These representations were untrue and misleading. Had PWC's conduct conformed to its professional obligations, it would have revealed Petrobras' fraudulent scheme. PWC's failures caused direct harm to Plaintiff.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa. Jurisdiction is also conferred by 28 U.S.C. § 1367.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District and the Company's ADRs are traded on the NYSE, which is located in this District. Moreover, Petrobras maintains an office in this District and a portion of the acts constituting the violations of law complained of herein, such as the dissemination of materially false and misleading information to investors, occurred in or were issued from this District.

14. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

15. Petrobras is not immune from jurisdiction of the United States courts under the Foreign Sovereign Immunities Act because this action is based upon a commercial activity in the United States by Petrobras; or upon an act performed in the United States in connection with a commercial activity of Petrobras elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of Petrobras elsewhere that caused a direct effect in the United States.

## III. PARTIES

16. Plaintiff is a California resident who purchased Petrobras ADRs during the Relevant Period and has been damaged thereby. His purchases were made during the Relevant Period on the NYSE.

17. Defendant Petrobras is a Brazilian corporation with its principal executive offices located at Avenida Republica do Chile, No. 65, 20031-912, Rio de Janeiro, Brazil. Petrobras also has offices at 570 Lexington Avenue, 43rd Floor, New York, New York 10022, which it has referred to in SEC filings as its principal U.S. office.

18. Defendant PWC served as Petrobras' independent auditor beginning in January 2012. As independent accountant and auditor to Petrobras, PWC had access to key personnel, books and records of the Company and other materials through which the wrongful acts complained of herein could have been detected, revealed to the investing public, and/or corrected. PWC is a member firm of PricewaterhouseCoopers International Limited. Pricewaterhousecoopers Auditores Independentes has its principal place of business at Av. Francisco Matarazzo, 1400 - Água Branca, São Paulo - SP, Brazil. PWC negligently proclaimed that the Company's financial statements for fiscal years 2012 and 2013 were complete and had been conducted in accordance with IFRS. Between 2012 and 2014, PWC collected in excess of $26 million in fees for its services to Petrobras.

## IV. RELEVANT NON-PARTIES

19. Almir Guilherme Barbassa ("Barbassa") served as Petrobras' chief financial officer ("CFO") and chief investor relations officer from July 2005 until he tendered his resignation from the Company on February 5, 2015. In accordance with his roles at Petrobras,

Barbassa certified and signed its periodic financial reports filed with the SEC. In addition, he disseminated material misstatements to the investing public and failed to disclose material information to investors through other means, including scheduled calls with investors in which he participated.

20. Maria das Gracas Foster ("Foster") served as Petrobras' CEO and its chief international officer until tendering her resignation on February 5, 2015. As CEO, Foster certified and signed Petrobras' periodic financial reports filed with the SEC. In addition, she disseminated material misstatements to the investing public and failed to disclose material information to investors through other means, including scheduled calls with investors.

21. Costa served as Petrobras' Chief Downstream Officer from May 14, 2004 to around April 27, 2012 and was a member of the Executive Directorate during that time. His division held primary responsibility for refineries, oil products and import/export operations. Costa was responsible for certain of Petrobras' financial statements and personally signed many of the wrongfully inflated contracts underpinning the corruption and kickback scheme. After being the first Petrobras-affiliated individual arrested in connection with Lava Jato, he assisted with the investigation in exchange for a reduced sentence. Costa also served as the chairman of the boards of directors of the Alberto Pasqualini Refinery, the Abreu Refinery and the Complexo Petroquimico do Rio de Janeiro (the "Comperj Refinery"). Costa was also a member of the board of directors of Petrobras Transportes.

22. Renato de Souza Duque ("Duque") was the head of the Company's Engineering and Services Division and a member of Petrobras' Executive Board from 2003 until 2012. He has subsequently been arrested and indicted for his role in the scandal.

23. Nestor Cervero ("Cervero") was the director of Petrobras' International Division and was directly involved with the Lava Jato scandal. He was arrested and sentenced to more than a decade in prison for his role in the fraud.

24. Pedro Barusco ("Barusco") worked directly for Duque in the Engineering and Services Division of the Company. He was arrested, indicted and sentenced in connection with his role in the fraud, and agreed, as part of the terms of his plea, to disgorge $97 million in bribes he personally collected.

25. Venina Velosa da Fonseca ("Fonseca") was a longtime Petrobras executive fired by the Company after years of attempting to end the corruption at Petrobras by pointing out discrepancies and excessive contracts to senior executives. During her employment at the Company, she was alternately transferred thousands of miles away, *de facto* demoted, threatened and harassed for failing to be complicit with the fraud.

## V. SUBSTANTIVE ALLEGATIONS

### A. Relevant History of Petrobras

26. Petrobras directly or through its subsidiaries prospects, drills, refines, processes, trades and transports crude oil from onshore and offshore oil fields and from shale or other rocks. It is also involved in the production of oil products, natural gas and other liquid hydrocarbons and carries out energy-related activities, such as research, development, production, transport, distribution and trading of all forms of energy, as well as any other correlated or similar activities.

27. Petrobras was founded in 1953, and enjoyed a state-sanctioned monopoly in the oil industry for over four decades. Even when that exclusivity lapsed in 1997, the Company and the Brazilian government remain inextricably intertwined. The Brazilian government is the

Company's controlling shareholder and Brazilian law requires that the Brazilian government own a majority of Petrobras voting stock.

28. Because it owns a majority of the Company's voting stock, the Brazilian government has the power to elect the members of Petrobras' board of directors (the "Board" or "Board of Directors"). These appointments are typically made in such a way as to reflect the prevailing political currents in Brazil as a whole, with the ruling party (during the Relevant Period, the Workers' Party or in Portuguese, the Partido dos Trabalhadores ("PT")) holding the most positions, with representation from other parties that are part of the majority coalition (which included, during the Relevant Period, the Brazilian Democratic Movement Party or (in Portuguese, the Partido do Movimento, or "PMDB") and the Progressive Party (in Portuguese, the Partido Progressista, or "PP")). The Workers' Party, PMDB and PP divided up Petrobras' seven divisions, or Directorates, between them, and were largely responsible for appointments within their Directorates. Executives were expected to, and did, provide kickbacks siphoned from overbilling projects to their political patrons known as 'padrinhos' or godfathers, in return for sponsoring the executives' careers.

29. The Petrobras Board of Directors, appointed by, and serving at the grace of, these government representatives, in turn select from the Company's senior executives an Executive Board or Executive Directorate, which makes the majority of the decisions involving Petrobras' operations. Because of the combination of their high-ranking roles at the Company and their strong political connections, members of the Executive Board and the Board of Directors had the ability to influence the Company and its policies at a whim, with virtually unchecked controls on their behavior and without adequate controls and procedures in place at Petrobras to detect, deter and eliminate wrongdoing.

30. Beginning in 2006, the Company undertook a major expansion, fueled by new offshore petroleum discoveries and technological advancements making formerly unreachable resource reserves accessible by new drilling techniques and equipment. While these new fields were loaded with significant resources, the challenges they posed were also significant, given that the new fields were as far as 300 kilometers off the coast of Brazil, and lay under as much as 2,000 meters of water and an additional 2,000 meters of salt. The opportunity the fields presented provided the impetus for what was by far the biggest capital raising endeavors in the Company's history.

31. In 2010, the Company conducted the largest stock sale in history, listing $72.8 billion in shares on the Bovespa stock exchange. It remained active in debt markets and issued additional shares throughout the operation of the Lava Jato schemes. Prior to the discovery of the fraud and its accompanying loss of shareholder value, Petrobras became the fourth largest publicly traded company in the world, as measured by market capitalization. By 2013, the Company was also the most indebted company in the world.

32. To deal with its expected increased volume of oil, Petrobras intended to develop and/or acquire additional refineries, to reduce its reliance on outsourcing its refinery business. Between its ramped up off-shore drilling in high risk, high development cost fields, and the Company's expansion plans for its refinery operations, it was essential that Petrobras continue to feed investors positive financial results crucial to keep its share price and credit rating high.

### B. Petrobras Orchestrated a Massive Fraud Prior to and During the Relevant Period

33. The Company engaged in detailed, organized and widespread fraud for at least a decade. The fraud affected its financial statements at all times during the Relevant Period, misleading Plaintiff and other investors. This scheme was designed to benefit insiders and their

political patrons by intentionally eliminating competition on the majority of the Company's projects, grossly inflating the prices of those projects and distributing a portion of the excessively paid prices to the insiders responsible for the violations. Whistleblowers warning senior executives against these wrongdoings were ignored and/or threatened, demoted and marginalized. As a consequence of this fraudulent scheme, the Company purchased assets such as refineries at prices well above their actual value, overpaid for contracted work, encouraged significant cost overruns and at all times caused select insiders to benefit, to the detriment of Plaintiff and other unsuspecting investors. During the Relevant Period, and despite the insidious nature of the corruption, Petrobras touted its transparency and compliance with applicable standards and lauded its anti-corruption policies.

34. The unveiling of the fraud began with an unrelated multiyear investigation launched in 2009. Information has slowly been unearthed in recent years and has revealed, in dribs and drabs, Petrobras' essential role in the Lava Jato scandal.

35. According to the Company's Form 6-K, filed with the SEC on April 23, 2015, in 2009 the Brazilian federal police initiated the Car Wash investigation. Initially, the investigation targeted known criminal organizations engaging in money laundering throughout several Brazilian states. Lava Jato was extremely broad in focus and involved several sectors of the Brazilian economy.

36. In mid-2013, a Brazilian federal police investigator, Erika Mialik Marena, noticed well-known money launderer and career criminal, Alberto Youssef ("Youssef"), acquired a $125,000 Land Rover, which he gifted to Costa.

37. Petrobras became a subject of interest because investigators were curious why a former division manager of Petrobras was receiving "an expensive car from a money launderer,"

who had been arrested no fewer than nine times for using private jets, armored cars and a web of false companies in order to move illicit cash, prompting inquiries as to "Who is that guy?"

38. Once the Company became a focus of the Lava Jato investigation, the massive scale of the corruption and the sheer volume of people and companies involved became apparent to investigators. Taken together, the publicly released witness testimony, the arrests, and the frozen assets paint a very clear picture of the kickback scheme. In fact, as discussed below, the evidence of this illegal bribery scheme was so indisputable that Petrobras and PWC were forced to admit that the scheme likely infected each and every one of the Company's contracts with the Cartel. As mentioned above, the scheme involved Petrobras executives conspiring with members of the Cartel to rig bids on major contracts, to be awarded to pre-selected members of the Cartel, who each were given their 'turn' to win these rigged contracts, often inflated by up to 20%. In exchange for awarding these rich contracts to Cartel members, Company executives would typically receive 3% of the value of the contracts as a cash bribe to be split among various co-conspirators, including politicians and money launderers.

**C. Highly Placed Executives At Petrobras Knew of the Scheme and Were Active and Necessary Participants**

39. Approximately 2,000 Petrobras employees have been reported to be under investigation with respect to Lava Jato, with authorities from the Brazilian government seizing thousands of phones and computers believed to contain evidence of the corruption. It is beyond reasonable dispute that the corruption went to the highest levels of the Company, and specifically Costa, Duque, Cervero and Barusco (collectively, the "Corrupt Executives") have been arrested, charged, indicted and sentenced. In addition to the Corrupt Executives, strong evidence indicates that Foster also had knowledge of the scandal. Although Foster has yet to be charged, she did

resign in disgrace over the scandal, along with several other highly placed Petrobras executives, including Barbassa.

*i. Costa*

40. Costa was the Company's former Chief Downstream Officer and, as its Director of Supply, served as the head of Petrobras' Supply Division. He was a member of the Executive Directorate and worked closely with other members of the Corrupt Executives. It was through his association with Youssef, under surveillance in the initial Lava Jato investigation, that Petrobras' role in the scheme first came to light.

41. Costa was personally responsible for certain of the Company's financial statements, and he was the signatory to many of the inflated contracts that defrauded Company investors. He has admitted to the existence of, and his participation in, the criminal conspiracy underlying the fraud and has, in exchange for reduced punishment, substantially aided prosecutors and investigators by providing details about the structure of the fraud and who participated in it.

42. Costa's admissions included acknowledging that he knew that, as of approximately 2004 when he became Chief Downstream Officer, Petrobras factored in an overage into all or substantially all of its contracts with Cartel member companies, with the expectation that this overage would be kicked back directly to Petrobras officers, directors and Brazilian government officials. Further, Costa has admitted that he was directly involved with the overpricing of other contracts and the actual payment of bribes as a part of the scheme.

43. Costa admitted that he personally received cash kickbacks. When asked if he, as a director, received some of the money, he testified:

Q. But my question was, did the directors, did you receive some of this money?

> A. Yes. What happened on average was, of the 1 per cent that was for the PP, on average, because depending on the contract it could be a bit more or a bit less, 60 per cent went to the party, 20 per cent was for expenses, for receipts, the expense of sending etc etc, these are all average values, they weren't always the same, and the remaining 20 per cent was distributed, 70 per cent to me, and 30 per cent to Janene or to Alberto Youssef.
>
> Q. And how did you receive your part?
>
> A. I got it in cash, normally at home or in the shopping centre or in the office after I opened my consultancy.
>
> Q. Who delivered the money to you?
>
> A. Normally, Alberto Youssef or [congressman José] Janene.

44. Regarding the overpayment of contracts, Costa testified that he understood that the actual monetary cost of the Lava Jato operation to the Company greatly exceeded the 3% charge that was paid back in bribes, because of the expected-cost-plus-20% bid inflation practices. Because the Cartel bids were rigged, substantially all of Petrobras' biggest contracts were marked-up 20% over Petrobras' expected costs, allowing the Cartel to profit handsomely in exchange for returning a portion of that profit back to the Company and its executives. He stated:

> All the resources were going to the area of exploration and production, which is the most important area for any oil company. When these activities began, it became clear to me, and I didn't know this when I joined the board in 2004, that there was a, in quotation marks, a prior "agreement" between the companies in relation to these works. In other words, it was said very clearly to me by some of the [Cartel] companies, by their presidents, that there was a process of selection of contracts for works inside and outside Petrobras. So, for example, a hydro-electric plant in such and such a place, which company is most available at this moment to build it? And this cartelisation results in an addition to the price.
>
> In the area of oil and gas, these companies, normally, between the indirect costs and their profit, their so-called BDI [indirect costs and benefits], they normally put in something like 10 to 20 per cent. So depending on the work, on the risk of the project, and the conditions of the project, they put in 10 to 20 per cent for their BDI. What would happen specifically in works for Petrobras? Let's say the BDI

> was 15 per cent, so they would add, on average, another 3 per cent. And this 3 per cent was allocated to political agents.
>
> Q. So the companies would agree among themselves the prices they were going to propose?
>
> A. Yes.
>
> Q. So this included the price they wanted?
>
> A. Yes, normally as I said, the BDI in a range of 10 to 20 per cent and normally, on average, 3 per cent of political adjustment.

45. Costa had detailed notes regarding the bribes paid to various politicians, which he tracked in a daybook (subsequently seized by authorities). He testified that while at Petrobras, he had actual knowledge that other divisions, including specifically the International Division led by Cervero, participated in the bribe and kickback schemes.

46. Ultimately, in addition to providing substantial assistance to prosecutors, Costa agreed to repay approximately $27 million out of his direct profits wrongfully pocketed from his participation in the fraud. He was convicted in April 2015 on charges of money laundering and racketeering and sentenced to seven years and six months in prison as part of his plea bargain.

*ii. Duque*

47. Duque was Petrobras' former Chief Services Officer and a member of its Executive Directorate. He had nearly $30 million in offshore accounts deemed inconsistent with his salary at Petrobras, flagged by overseas bank regulators as being connected to corruption.

48. As the individual in charge of Petrobras' engineering and services division, Duque regularly recommended for approval contracts reflecting inflated costs to the Company. This direct participation allowed him to ensure that there was sufficient overpayment to allow the kickbacks to be paid out. His department was ultimately responsible for contracting and approving the majority of Petrobras' capital investments.

49. Fernando de Castro Sa ("Castro"), an attorney working in the Supply Division, testified that under Duque, regulations were routinely ignored if doing so allowed the Engineering & Services Division to better effectuate the scheme. When Castro attempted to enforce the Company's written policies to cut down on the opportunities for fraud, he was personally chastised by Duque, who insisted that the policies allowing the fraud to continue to prosper unabated.

50. Duque was convicted in September 2015 on charges of corruption and sentenced to twenty years and eight months in prison. In his ruling, Justice Sergio Moro found Duque to have committed money laundering on dozens of occasions.

iii. *Barusco*

51. Barusco, as the Company's former executive manager of engineering, reported directly to Duque and was his "right-hand man." He has also assisted the government investigation, agreeing to work with investigators after his name had been circulated as a possible target of the probe. His testimony directly implicated Duque as an individual who personally received bribes from the Cartel.

52. Barusco stated that the bids received by the Cartel were always near the maximum of Petrobras' internal projections, which allowed maximum Cartel profit (and maximum opportunity for kickbacks). He was also involved with devising the budgets at Petrobras that implicated the budgetary guidelines.

53. Barusco has been sentenced on corruption charges. As part of his plea agreement, he provided information about how other companies, including Rolls-Royce, also paid improper bribes. In his November 20, 2014 Terms of Cooperation, he noted that the payment of bribes within Petrobras was both endemic and institutionalized and the corruption was considered part

of the normal relationship between suppliers, the Company, and political patrons. Barusco also agreed to disgorge an astonishing ***$97 million*** in illicit bribes that he had received.

*iv. Cervero*

54. Cervero is the former Director of the International Division of Petrobras and was a member of the Executive Directorate. He was a financial director of the Company's fuel distribution subsidiary. He was indicted in connection with his role in the bribery and corruption enterprise in December 2014 and arrested in January 2015, with additional charges tacked on in a February 2015 indictment. Cervero was the third Petrobras executive to be charged and arrested as a result of the Lava Jato investigation.

55. Cervero's participation in the corruption was corroborated by Costa in his testimony to investigators, whom he identified as a PMDB appointee to the Company. According to reports, Cervero attempted unsuccessfully to shield some of his ill-gotten gains though transfers to family members

56. He was sentenced to 12 years and three months in prison on money laundering and corruption charges in August of 2015, in addition to an earlier five year prison sentence he received on related Lava Jato charges in May 2015. On November 25, 2015, it was reported in the NEW YORK TIMES that Cervero had been pressured by both a sitting Brazilian senator, Workers' Party Senator Delcidio do Amaral, as well as Andre Santos Esteves, the CEO of Brazilian investment bank BTG Pactual, not to take a plea agreement in exchange for millions of dollars in additional bribes and assistance fleeing to Spain.

v. *Foster*

57. Although Foster has yet to be arrested or indicted in relation to the corruption scandal, there is strong evidence of her having actual knowledge of the wrongdoing while she

was a Petrobras senior executive, first as the Company's chief gas and energy officer, and then as it CEO.

58. Prior to becoming CEO in 2012, Foster was informed repeatedly about irregularities in the contracts that formed the foundation of the kickbacks, bribery and bid inflation. Foster worked directly with Fonseca, who alerted Foster to concerns about inflated contracts as far back as April 2009.

59. During an interview with Globo TV, Fonseca said that she "met with the CEO [Foster] when she was director of the gas and energy unit. At that time, we discussed the matter [of inflated contracts and services paid for but not carried out]. I handed over to her the documents about the complaints. Afterward, she had access to these anomalies at the management meetings."

60. Fonseca also pointed out dramatic overcharges to at least one of the refineries under construction as part of Petrobras' ongoing expansion. Instead of acting on this advice in a constructive manner, however, the Company undertook no effective measures to change its corrupt culture. Instead, it shipped Fonseca to Singapore, ultimately terminating her employment.

**D. Dramatic Over-Inflation of Costs Are Exemplified By the Company's Asset and Refinery Purchases and Construction Contracts**

61. As part of its corporate plan to become more self-sufficient and a vertically integrated company, Petrobras undertook a dual-pronged effort to acquire and build refineries. Each of these projects became a textbook example for graft and kickbacks, and cost shareholders over a billion dollars in inflated costs.

*i. The Pasadena Refinery*

62. The Pasadena refinery serves as an example of the overpayment for assets endemic at the Company. The Pasadena refinery is located in Texas and has production in excess of 100,000 barrels per day and employs more than 500 contract and permanent employees. After being offered the opportunity to acquire the nearly century old Pasadena refinery for less than $40 million in approximately 2005, the facility was sold to Transcor Astra Group SA ("Astra") in 2005 for approximately $42.5 million. The very next year, Petrobras agreed to purchase a 50% interest in the Pasadena refinery for a staggering $431 million. Once Astra exercised an option to force the Company to purchase the remaining 50% stake, costly and contentious litigation ensued, the ultimate result of which was Petrobras' agreement to purchase the remainder of the interest in the refinery for $820 million on top of its initial investment, bringing the Company's total cost for the Pasadena acquisition to nearly $1.2 billion.

63. Even Costa acknowledged that the refinery was "very old" and in need of serious, costly upgrades. However, he was offered $1.5 million in cash not to cause problems with the acquisition. Federal prosecutor Carlos Fernando dos Santos Lima believed that bribes connected to the initial purchase totaled at least $15 million. Marinus de Vries Marsico, a prosecutor at Brazil's Federal Accounts Court, said of the Pasadena deal that it was "an affront to Brazil; it was a joke that damaged Brazil's reputation for being able to do business in a serious, responsible way."

64. Insiders attempted to justify the obviously inflated price paid. Foster disputed the widely reported price paid by Astra, claiming (with no actual support) that the price was eight times larger. She also claimed that the huge price paid by Petrobras was required to be the managing partner for the Pasadena refinery, stating "We had a lot of control over Astra … but it

had to pay for that control." The Company also claimed that it would capture extra profit in refinery by giving it a source of refining its Marlim-grade heavy crude oil. However, prosecutors have noted that "[b]esides being obsolete and in a terrible state, the refinery did not have the capacity to refine Marlim crude produced by Petrobras."

*ii. Abreu e Lima Refinery*

65. The overpayment for the Pasadena refinery pales in comparison to the Company's Abreu e Lima ("Lima") refinery. The Lima refinery, the first built in Brazil in nearly 40 years, came in both massively late and incredibly over budget.

66. The Lima refinery was originally to be 40% funded by Venezuela, a contribution which was never received. It was also projected to cost $3.5 billion, but costs soared to nearly $20 billion. Logistically, the location made little sense for the Company, as it was in northeastern Brazil, hundreds of miles from most of the rest of the country's oil industry infrastructure. It was a political concession allowing politicians to bring a huge project (and its accompanying employment prospects) to their locality. Executives were only too willing to grant these favors, as many Company executives and directors owed their positions to the same members of the Brazilian political machine. Erton Madeiros Fonseca, a top executive of Galvao Engenharia, a Cartel contractor, admitted paying bribes of at least $1.5 million in connection with his work at the Lima refinery.

67. Brazil's auditing body, the Court of Accounts (known by its Portuguese initials "TCU"), has flagged "serious irregularities" at the Lima refinery, estimating that the overpayment for work was approximately $145 million. Some estimates exceed $500 million in deliberately inflated costs. Auditor Homero de Souza recommended that all further funding be blocked from the project, stating "It was so obvious, this pattern of theft. I'd never seen anything

on the scale of Abreu e Lima." Independent oil experts were blunt in their assessment of the Lima refinery. Sam Margolin, a refining company analyst with Cowan and Company based out of New York, stated that "I've never heard of a refinery that cost more than [the Lima Refinery]. Refineries are expensive and cost overruns and politics are common, but it still is way beyond anything I've seen anywhere." As a comparison, Saudi Aramco and France's Total SA built the 400,000 bpd Jubail refinery in Saudi Arabia for $10 billion, or $25,000 a barrel, less than a third the production cost of the Lima refinery. China's Sinopec plans to complete a 200,000 bpd refinery in Guangdong next year for $9 billion, or $45,000 for each barrel of new capacity, about half the cost of Lima. Saudi Aramco and Royal Dutch Shell Plc built a 350,000 refinery at their Port Arthur, Texas facility, for $10 billion, or $28,571 a barrel, a third the cost of the Lima refinery.

68. In his plea agreement, Barusco admitted that "in the case of [Lima], there was a clear overbilling." Indeed, Barusco testified that the overbilling was "most obvious in [Lima]." With respect to Lima, Barusco testified that in addition to pre-selecting Cartel winners, the Cartel "wanted to impose prices 'very much above the budget' of Petrobras, not only in [the first bid but also] in the rebid." He further explained that there was "'organized pressure' to close the contract values at prices at the very top limit of the Petrobras budget."

*iii. The Comperj Refinery*

69. Comperj, still under construction, will have an estimated construction cost of approximately $93,000 for each barrel of refining capacity, making it one of the most expensive refineries ever built. Work on the Comperj Refinery slowed to a virtual crawl as the Lava Jato scandal broke and the Company found a need to hoard resources. The project, announced in 2006 was expected to be completed in 2013 at a cost of $6.5 billion. The Comperj refinery's

completion date has been delayed until at least 2020. Costs as of 2015 were expected to be at least $15.3 billion.

70. The TCU issued a scathing report in late 2014, stating that the Comperj refinery could cost as much as $47.7 billion, and argued that "Petrobras has not disclosed, in a faithful manner, the true investment needs for the Comperj program, nor the works that are in progress for [Phase 1] operation of the refinery. Even in publications destined [to go] to its shareholders and market regulators, the information is seemingly conflicting and transparency is lost."

*iv. SBM Offshore*

71. Other projects, in addition to refineries, were infested by bribes. One prime example was the Company's lease agreements with the Dutch company SBM Offshore N.V. ("SBM"). Although the media had begun to probe by February 2014 whether there were bribes being paid by SBM to the Company and its executives, and a former SBM employee, with access to an internal investigation, stated that there were at least $139 million in improper payments and bribes made, Petrobras staunchly denied the allegations. It claimed to have established an internal committee, and reported, just six weeks after the initiation of the internal committee, that:

> Petrobras announces that the Internal Investigation Commission, created on 02/13/2014, to look into accusations of supposed bribe payments made to employees of the Company, involving the company SBM Offshore, concluded that, based on work performed and limited to its regulatory scope, no facts or documents were found that prove the payment of bribes to employees of Petrobras.

72. Petrobras made this announcement despite the fact that two years earlier, SBM stated publicly that it had been made aware of "certain sales practices involving third parties that may have been inappropriate."

73. However, both Foster, on November 17, 2014, and the Dutch Public Prosecutor's Office, on November 26, 2014, both acknowledged that improper payments were made from SBM agents in connection with the bids and contracts between the two companies.

**E. Petrobras Used the Excessive Payments Expended in Bribes and Elevated Bids to Inflate its Financial Results**

74. Accounting standards require that assets such as property, plants and equipment are measured at cost, where that cost is the equivalent of the asset's *fair value*. Both GAAP (which governed the Company's financial statements prior to January 1, 2011) and IFRS (which governed the Company's financial statements after January 1, 2011) prohibited Petrobras's capitalization of bribes and inflated costs as "assets" in the Company's financial statements.

75. IFRS's International Accounting Standard 16 states that "[a]n item of [PP&E] that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction." Similarly, under GAAP, Accounting Standards Codification 360, companies may record the "historical cost" of PP&E, which includes only "the costs necessarily incurred to bring it to the condition and location necessary for its intended use."

76. Despite claiming that its financial statements were prepared consistent with IFRS standards, Petrobras accounted for the Pasadena refinery, the Lima refinery, the Comperj refinery—and indeed, *all* of its assets that were inflated as a result of the Lava Jato corruption—at the cost the Company paid, *including* the bribes. These overpayments should have been recorded as expenses. By doing so, Petrobras inflated the values of its assets, understated its actual operating expenses and overstated its net income.

### F. PWC's Negligence Harmed Plaintiff

77. PWC's failure to detect this pervasive and institutionalized scheme was a clear violation of its most basic professional duties as the Company's independent auditor beginning in January 2012.

78. PWC knew that its name, and the imprimatur of the involvement of a worldwide accounting firm, were used by Petrobras to market its ADRs to investors, including Plaintiff. PWC knew that investors, including Plaintiff, would rely upon its involvement and audit practices, including its assessment of the Company's internal controls and compliance with Sarbanes-Oxley, in deciding to purchase the Company's ADRs.

79. Plaintiff relied (and was both entitled and intended by PWC to rely) on PWC's known role and responsibilities, on its reports, and upon the absence of any disclosure by PWC of an ongoing bid rigging and kickback scheme infecting over one-third of the Company's assets, which were already subject to public scrutiny because of cost overruns and delays. Plaintiff's reliance was actual, justified and the proximate cause of Plaintiff's losses. Had PWC made the required disclosures, undertaken reasonably competent audits and reviews of Petrobras's financial statements in accordance with industry standards, and made truthful representations instead of false ones, Plaintiff's losses would have been avoided

80. PWC issued opinions for years 2012 and 2013—which were incorporated in Petrobras' public filings—that Petrobras's financial statements complied with IFRS, and represented that those results fairly and accurately presented the Company's financial condition and results of operations in conformity with IFRS. PWC also claimed that it conducted its audits in compliance with the standards of the Public Company Accounting Oversight Board ("PCAOB"). Additionally, PWC certified that Petrobras's internal controls over financial reporting were effective in all materials respects. PWC's assurances in this regard were set out in

its audit opinions dated February 25, 2014 (for fiscal year 2013), and February 4, 2013 (for fiscal year 2012). A reasonable person reading PWC's audit opinions fairly and in context would conclude that the financial statements and evidence reviewed by PWC were the bases of its opinions.

81. PWC's negligent failure to uncover the fraud was not limited to its regular audits of the Company's financial statements. Instead, in late 2013, PWC was asked to appraise the "net book equity value" of the Abreu refinery as of March 31, 2013 in connection with the merger of Refinaria Abreu E Lima S.A. – a wholly owned subsidiary of the Company whose sole asset was the Abreu refinery – with and into the Company. This corporate consolidation would "allow greater flexibility for new investments and greater efficiency in the execution of [the Company's] strategic decisions." PWC issued an appraisal which valued Abreu's PP&E at $R 22 billion, and its net book equity value to be $R 10.7 billion.

82. In PWC's engagement letter with respect to this appraisal of Abreu, it noted that it would "report in writing any significant deficiencies in internal control considered relevant to the balance sheet [of Abreu] that we may identify during the audit." In the actual appraisal report, PWC further noted that "[w]e believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our conclusion [concerning the net book equity value of Abreu.]" These statements were clearly negligent.

83. As the Company and PWC have now admitted, Petrobras's internal controls were materially inadequate, it failed to comply with IFRS, and its financial reports were false and materially misleading because, among other reasons, Petrobras falsely reported the 3% kickbacks as assets, booked under PP&E. PWC negligently assured investors that for 2012 and 2013, PWC had conducted its audits in compliance with PCAOB standards, Petrobras's financial statements

conformed with IFRS and fairly and accurately presented the Company's financial condition, and the Company's internal controls were effective. Likewise, PWC had made the same promises in connection with its appraisal of the book value of Abreu as of March 31, 2013, in which PWC negligently failed to obtain appropriate audit evidence, and negligently failed to identify massive holes in the Company's internal controls with respect to Abreu.

84. As a result of PWC's audit and other services, PWC was frequently present at Petrobras's offices, and had access to the Company's confidential books and records. As the Company's outside auditor, PWC had a professional duty to evaluate the Company's internal controls, financial and accounting systems, and financial reports. Given that the Company's PP&E represented up to 70% of its assets, PWC's professional obligations required it to look critically at that PP&E, which was already subject to public scrutiny because of the cost overruns and delays at the Abreu and Comperj refineries. PWC was grossly negligent for not adequately doing so.

85. PWC's assurances to investors were made despite the existence of red flags concerning internal controls and financial reporting with respect to several of the major capital projects implicated in the scandal, including the Abreu and Comperj refineries. PWC was reckless and grossly negligent in not knowing that these massive cost overruns and delays were the result of a kickback and bid rigging scheme. PWC failed to investigate, for example, why the Abreu refinery was completed over four years behind schedule, at a cost of $18.6 billion, over $14 billion more than the original estimate. During the period that PWC acted as auditor, there were internal investigations into kickbacks and overpayments, news reports in the Brazilian press regarding corruption at Petrobras, reports that Brazilian lawmakers had assembled a committee to investigate kickbacks paid to Petrobras by Dutch firm SBM Offshore, and the arrest of a

former Petrobras senior executive, Paulo Costa, for participation in a money laundering scheme. Any minimally competent auditor would have been aware of these red flags and investigated.

86. Had PWC diligently investigated these red flags and audited the Company's financial statements in conformity with prudent auditing practice and generally accepted auditing standards, the pervasive fraud and malfeasance would have been revealed and losses to Plaintiff would have been avoided. PWC's audits of the Company's financial statements were not conducted in accordance with generally accepted auditing standards. PWC negligently failed to plan and perform its audits in a manner that would detect even gross and material misstatements and deficiencies in the Company's financial statements. At the very least, if PWC had conducted a minimally probing audit of the Abreu and Comperj refineries, it would have discovered the bid rigging and kickback scheme.

87. Specifically, by ignoring these many red flags and failing to discover the fraud, PWC violated a number of professional standards set out by the PCAOB. The following are some of PWC's reckless and negligent failures to properly adhere to generally accepted accounting standards for its 2012 and 2013 examinations and reviews.

88. PWC violated PCAOB AU No. 230, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report. This standard required PWC to obtain reasonable assurance that Petrobras's financial statements were free from material misstatement. PWC violated this standard by failing to identify the massive, admitted kickback scheme, which infected over $80 billion of the Company's contracts, amounting to approximately one-third of the Company's assets.

89. In light of the red flags described above, and the significance of PP&E to Petrobras's balance sheet, PWC violated PCAOB Accounting Standard No. 13, which states that

"[t]he auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement," and Accounting Standard No. 15, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. ..." These accounting standards required PWC to increase substantive testing of the PP&E line item, and to otherwise obtain more persuasive audit evidence with respect to PP&E, because of the higher level of risk associated with PP&E as a result of the cost overruns, delays, public scrutiny, and importance to the Company's financial statements.

90. PWC also violated PCAOB AU 316 ("Consideration of Fraud in a Financial Statement Audit"), which states that "the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence ... [T]he auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest." Despite the massive cost overruns and delays, and red flags identified above, PWC did not exercise the requisite professional skepticism with respect to the Company's stated values for PP&E.

91. PWC violated PCAOB AU 317 ("Illegal Acts by Clients"), which states that "[t]he auditor should make inquiries of management and the audit committee concerning the client's compliance with laws and regulations and knowledge of violations or possible violations of laws or regulations. Where applicable, the auditor should also inquire of management concerning—The client's policies relative to the prevention of illegal acts [and] [t]he use of directives issued by the client and periodic representations obtained by the client from management at appropriate levels of authority concerning compliance with laws and

regulations." PWC failed to test the Company's representations and detect an "institutionalized" and "endemic" bribery scheme affecting one-third of the Company's assets, and therefore violated AU 317.

92. PWC violated PCAOB 326 ("Evidential Matter"), which states that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." PWC failed to obtain sufficient evidence of the Company's internal controls and financial results to have a reasonable basis to form an opinion regarding the Company's financial statements or internal controls.

93. PWC violated PCAOB 330 ("The Confirmation Process") by failing to obtain and evaluate communications from third parties who were in a position to identify the bid rigging and kickback scheme. For example, PWC should have sought confirmations from third parties of Petrobras's explanations for the cost overruns and delays with respect to the Abreu and Comperj refineries.

94. PWC violated AU 410 ("Adherence to Generally Accepted Accounting Principles") by falsely certifying that the Company's financial statements for 2012 and 2013 were presented in accordance with generally accepted accounting principles when, in truth, they grossly misrepresented the company's financial results.

95. In a final example of PWC's failures, PWC's certification that Petrobras's internal controls were effective during years 2012 and 2013 violated a number of its professional obligations, including PCAOB Standard No. 5, which required PWC to test the effectiveness of Petrobras's internal controls through a "mix of inquiry of appropriate personnel, observation of the company's operations, inspection of relevant documentation, and re-performance of the

control." In truth, the Company's internal controls suffered from systemic and material weaknesses, causing the Company's financial statements to be grossly misleading.

96. Despite PWC's obvious negligence, PWC was paid handsomely for its services: $7.7 million for its 2012 work, and $8.6 million for its 2013 work.

**G. Petrobras and PWC's Material Misstatements and Omissions**

97. Petrobras ADRs have traded on the NYSE since August 2000 under the ticker symbol "PBR" and its preferred equity trades under the ticker "PBR/A."

98. On May 19, 2010, Petrobras filed a Form 20-F with the SEC falsely stating its purported financial results for the year ended December 31, 2009. Petrobras reported PP&E assets of $136.167 billion, total assets of $200.27 billion, and net income of $15.504 billion. The 2010 Form 20-F included Sarbanes-Oxley ("SOX") certifications by Barbassa and the Company's then-CEO Jose Sergio Gabrielli de Azevedo, which stated, in relevant part, as follows:

> 1. I have reviewed this annual report on Form 20-F of Petróleo Brasileiro S.A. – PETROBRAS (the "Company");
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;
>
> 4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

99. Petrobras further falsely stated that:

Each of the Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2009, based on the criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, each of the

> Company's management has concluded that as of December 31, 2009, each Company's internal control over financial reporting is effective.
>
> * * *
>
> The management of each Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2009, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.

100. On May 25, 2011, Petrobras filed a Form 20-F with the SEC falsely stating its purported financial results for the year ended December 31, 2010. The Company reported PP&E assets of $218.567 billion, total assets of $308.683 billion, and net income of $19.184 billion. The 2010 Form 20-F included SOX certifications by Azevedo and Barbassa and statements attesting to the suffiicency of Petrobras' internal controls that were substantially similar to those set out in paragraphs 98-99 above.

101. On March 30, 2012, Petrobras filed a Form 20-F with the SEC falsely stating its purported financial results for the year ended December 31, 2011. The Company reported PP&E assets of $182.465 billion, total assets of $319.410, and net income of $20.121 billion. The 2011 Form 20-F included SOX certifications by Foster and Barbassa and statements attesting to the suffiicency of Petrobras' internal controls that were substantially similar to those set out in paragraphs 98-99 above.

102. On February 4, 2013, the Company issued a press release, which was filed as a Form 6-F with the SEC on February 6, 2013, falsely announcing its purported financial results for the year ended December 31, 2013. Petrobras reported PP&E assets of $205 billion, total assets of $332 billion, net income of $10.9 billion and costs and expenses of $127.2 billion.

103. On April 26, 2013, Petrobras issued a press release falsely reporting its financial results for the quarter ended March 31, 2013. The Company reported PP& E assets of $214

billion, total assets of $345 billion, net income of $3.9 billion and costs and expenses of $31.4 billion.

104. On April 29, 2013, Petrobras filed a Form 20-F with the SEC which included the false information set forth in the Company's press release dated February 4, 2013. The 2012 Form 20-F included SOX certifications by Barbassa and Foster and statements attesting to the suffiicency of Petrobras' internal controls that were substantially similar to those set out in paragraphs 98-99 above.

105. The April 26, 2013 Form 20-F also contained the report of PWC, which falsely stated, in relevant part:

> **In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, of comprehensive income, of cash flows and of changes in stockholders' equity present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2012, and the results of their operations and their cash flows for the year ended December 31, 2012 in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).** The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. **We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).**

106. On April 30, 2013, Petrobras filed a Form 6-K with the SEC which contained the falsely stated financial information released on April 26, 2013.

107. On August 9, 2013, the Company issued a press release falsely reporting the financial results for the quarter ended June 30, 2013. The Company reported PP&E assets of

$204 billion, total assets of $338 billion, net income of $2.7 billion and costs and expenses of $30.2 billion.

108. On August 13, 2013, the Company filed a Form 6-K setting forth the falsely stated financial results released on August 9, 2013.

109. On October 25, 2013, the Company issued a press release falsely announcing its financial results for the quarter ended September 30, 2013. The Company reported PP&E assets of $208 billion, total assets of $340 billion, net income of $1.5 billion and costs and expenses of $31.4 billion.

110. On October 28, 2013, Petrobras filed a Form 6-K setting forth the falsely stated financial results released on October 25, 2013.

111. On February 25, 2014, the Company issued a press release wherein it falsely announced its financial results for the year ended December 31, 2013. The Company reported PP&E assets of $228 billion, total assets of $321 billion, net income of $2.6 billion and costs and expenses of $125 billion. In the release, Foster falsely stated:

> I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

112. On February 26, 2014, the Company filed a Form 6-K including the falsely stated financial statements released in the February 25, 2014 press release.

113. On March 7, 2014, the Company issued a press release regarding its internal controls over financial reporting, falsely stating in relevant part that:

Petrobras announces that its management is responsible for establishing and maintaining effective internal control over financial reporting and for its assessments of the effectiveness of internal control over financial reporting.

Our internal control over financial reporting is a process designed by, or under the supervision of our Audit Committee and our Chief Executive Officer and Chief Financial Officer, and effected by our board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with IFRS, as issued by the IASB.

* * *

Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

* * *

The effectiveness of our internal control over financial reporting as of December 31, 2013, has been audited by PricewaterhouseCoopers Auditores Independentes, an independent registered public accounting firm, as stated in their report dated February 25, 2014 included in our 2013 Audited Financial Statements.

114. On March 10, 2014, the Company filed a Form 6-K/A which included the falsely stated statements regarding its internal controls set forth in the March 7, 2014 press release.

115. On April 30, 2014, the Company filed its 2014 Form 20-F which included the falsely stated financial statements previously released on February 25, 2014. In addition, the 2013 20-F contained SOX certifications largely identical to those set forth *supra* in ¶98 falsely affirming that the financial information set forth in the 2013 Form 20-F was accurate. Further, the 2013 Form 20-F falsely stated that the "Company's management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013 … [and] has concluded that the Company's internal control over financial reporting was effective as of December 31, 2013." The 2013 Form 20-F further falsely stated on "March 31, 2014, our

internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

116. Finally, the 2013 Form 20-F contained the report of PWC, which falsely stated, in relevant part:

> **In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income and comprehensive income, changes in equity and cash flows present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2013, and December 31, 2012, and the results of their operations and their cash flows for the years ended December 31, 2013, and December 31, 2012, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013 based on criteria established in Internal Control - Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).** The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. **We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).**

117. On May 9, 2014, the Company issued a press release wherein it falsely announced its financial results for the quarter ended March 31, 2014. Petrobras reported PP&E assets of $241 billion, total assets of $354 billion, net income of $2.4 billion and cost and expenses of $31.4 billion. In the release, Foster falsely stated:

> I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program. All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose.

118. On May 12, 2014, the Company filed a Form 6-K which included the falsely stated financial results it had previously released on May 9, 2014.

119. On June 11, 2014, Foster, testifying before a Brazilian congressional committee, falsely stated that she was unaware of the bribery of Petrobras' employees, officers and executives.

120. On August 8, 2014, the Company issued a press release and announced its financial results for the quarter ended June 30, 2014. The Company reported PP&E assets of $254 billion, total assets of $363 billion, net income of $2.3 billion and costs and expenses of $32.9 billion.

121. On August 11, 2014, the Company filed a Form 6-K which included the falsely stated financial results it had previously incorporated in its August 8, 2014 press release.

122. Each of the foregoing statements regarding Petrobras' assets, financial statements and internal controls were materially false and misleading when made. In violation of GAAP and IFRS, Petrobras fraudulently announced inflated revenues, earnings and earnings per share. Petrobras further misrepresented its internal controls as being adequate when, in fact, they were inadequate and permitted the improper recordation of assets, profits and losses prior to and during the Relevant Period. Petrobras further misrepresented its compliance with applicable anti-bribery and kickback laws and regulations. PWC falsely stated that the Company's financial statements fairly presented its financial conditions and that it had conducted its audits in accordance with PCAOB standards.

123. When these misrepresentations became public, Plaintiff was substantially injured.

**H. The Revelation of the Fraud Slowly Comes to Light and Harms Plaintiff**

124. Although media reports had reported rumors of possible corruption, kickbacks and formal investigations into the Company's practices, Petrobras steadfastly denied the veracity

of these reports and vehemently asserted its innocence and the strengths of its policies and controls.

125. The truth slowly began to emerge on October 27, 2014. On that day, the Company issued a formal statement regarding the investigation into Operation Car Wash. More specifically, the Company noted that the police investigation, and the underlying facts thereof, could have an impact on its business. It noted that "'Lava Jato Operation' is an investigation that is being conducted by the Brazilian Federal Police. Within the scope of the cited operation, a former Petrobras director, as well as other individuals, have been charged with money laundering and organized crime. At the moment, investigations are underway on the practice of alleged crimes committed *against Petrobras*." Interestingly, and falsely, the October 27, 2014 announcement blamed others for the fraud "against Petrobras" instead of admitting that the fraud was being conducted by the highest ranking officials *at the Petrobras*.

126. The October 27, 2014 6-K also set out the steps which Petrobras was taking as a result of the investigation. The Company announced that it had hired a pair of independent investigation companies "with the aim of examining the nature, extension and impacts of the actions that might have been performed *against the Company* in the context of what have been said by former Director Paulo Roberto Costa." It further noted that Petrobras had taken the following measures "to carefully examine the facts":

- "Internal Investigative Committees have been set up [at the Company] to examine evidence or facts perpetrated against the company, as well as to assist administrative measures and resulting procedures";

- "Requested access to the records of the [government] investigation into 'Lava Jato Operation', including records for the money laundering and criminal organization case, as a way to closely monitor the investigation, which was granted by the court";

- "Requested access to the content of the 'state's evidence' turned in by former director Paulo Roberto Costa, which has not yet been granted by the court";

- "Has been providing clarifications to authorities (Brazilian Federal Police, Brazilian Justice Department and Brazilian Courts), including announcing measures carried out by the company";

- "Requested clarifications, as to assist its internal inquiry, from companies cited in the media whose activities are under investigation by 'Lava Jato Operation', especially following reverberations in the media of information regarding the cited 'state's evidence.'"

127. In making the statements contained in the October 27, 2014 6-K, however, the Company continued to contend that "government authorities have officially acknowledged the Company *as a victim* in this investigative procedure."

128. Even with the qualifying language Petrobras placed on its October 27, 2014 admissions, however, its stock price was negatively affected. The stock closed at $12.93 on October 24, 2013, the last day of trading prior to the release of the admissions contained in the October 27, 2014 6-K. After the 6-K's release, Petrobras stock closed on October 27, 2014 at $11.16, a drop of approximately 14%.

129. On November 1, 2014, the newspaper *O Estado de S. Paulo* reported that PWC refused to sign off on the Company's third quarter earnings, requesting a broader investigation into the corruption scandal. This news caused an additional drop of approximately 4% in the price of the Company's ADRs.

130. On November 9, 2014, the Financial Times reported that the Department of Justice and the SEC had each opened investigations into whether Petrobras or its employees, middlemen or contractors violated the Foreign Corrupt Practices Act ("FCPA"). This news caused a further drop of approximately 3% in the Company's ADRs.

131. On November 13, 2014, the Company issued a press release announcing that it would not timely file its third quarter 2014 financial statements because it would not be able to obtain a review report from PWC, further stating that "as a result of the time needed to: (i) gain greater understanding from the ongoing investigations by the independent law firms; (ii) make any adjustments to the financial statements based on the accusations and investigations related to the 'Lava Jato Operation'; and (iii) evaluate the need for internal controls improvements …" Despite announcing that Petrobras planned to release third quarter 2014 financial statements unreviewed by PWC "in recognition of the importance of transparency," its stock still declined an additional 2.5% on the news.

132. On November 14, 2014, Brazilian federal police arrested 18 individuals associated with the Lava Jato scheme, including former engineering director Duque, who became the second senior Petrobras executive, after Costa, arrested in connection with the money laundering, bribery and corruption scandal. The authorities also raided the offices of several of the construction and engineering Cartel member firms, including Odebrecht and Mendes Junior, seizing documents and arresting other executives highly placed at these firms. On the BVSP, Petrobras shares were held back from trading for an hour and a half after the stock exchange opened in order to allow "small, medium and large-scale investors transparency in relation to this issue" according to Bovespa CEO Edemir Pinto. Petrobras ADRs dropped an additional 2.5% on the news, hitting a new 52-week low.

133. On November 17, 2014, the Company held a conference call with investors, purportedly to discuss its third quarter results. In fact, executives opened the call with a lengthy discussion of the Operation Car Wash "accusations and investigations." Foster stated that the Company first learned of the investigations on March 20, 2014. She added that on October 8.

2014, Petrobras learned, through the depositions of Costa and Youssef, that the Company might have to make "possible adjustments in the financial statements of our Company." She further stated that "more time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms and we need more time ***if*** it is fundamentally important to improve our internal controls," reaffirming a belief in the adequacy of the controls and procedures in place at that time. Foster noted that Petrobras had seven internal investigation committees over the previous year and that it was still in the process of governance improvements.

134. Also during the November 17, 2014 call, Barbassa stated that if "there was any overpayment, payment above what would be a fair value for a good or service, in [that] case this value should be removed from PP&E line item invested." Barbassa claimed the removal would be the standard practice for either projects or incoming assets. He further stated that Petrobras would deduct "any amount that could be linked to bribery of any sort, any excess of price that would have been charged." Foster continued to endorse this theme, reiterating that the Company acknowledged "an obligation to write off from the asset a cost related to corruption … [Y]ou have an obligation to write off that cost, you have to discount that cost." However, neither Barbassa nor Foster acknowledged wrongdoing, and Barbassa noted that any write-down, "would … wait for the calculations [and that] … at this point any hypothesis would be too premature given the current status at the investigations and possible adjustments to be made. If the profit on the net income remains as expected and we don't really expect any effect on dividend payout." Foster concluded the call by stating:

> Petrobras is a company that dreams to produce more and more oil and to produce more and more transparency to the controlling shareholder in all of our portfolio of shareholders. Again, I would like to thank you for your attention and I urge you to please believe in the Company.

135. On December 11, 2014, federal prosecutors in Brazil charged 36 individuals across several companies connected to the scandal with 154 counts of corruption and 105 counts of money laundering.

136. On December 12, 2014, the Company announced that it was again delaying the release of its third quarter 2014 financial statements, as a result of the ever-widening probe into the Operation Car Wash scandal. It attributed the delay to "new facts that occurred after November 13, 2014, directly or indirectly related to the 'Lava Jato Operation.'" In its press release, the Company stated that the new information included that: (i) it had received a subpoena from the SEC on November 21, 2014, requesting documents related to an on-going investigation; (ii) that on December 3, 2014 the Company had gained access to the depositions of Julio Gerin de Almeida Camargo of Grupo Toyo and Augusto Ribeiro de Mendonca net of Grupo Setal; (iii) that it received on December 9, 2014 a class action complaint; and (iv) that on November 11, 2014, criminal charges were filed by the Brazilian Public Prosecutor's Office against Costa and the managers of other related companies for active corruption, passive corruption, organized crime, money-laundering and falsification of documents.

137. Also on December 12, 2014, the Brazilian business daily paper *Valor* published its latest chapter regarding the scandal, stating that Fonseca, a former Petrobras executive, had for *years* internally complained about corruption at the Company, and backed up her claims by showing that both Costa and Foster had received, and failed to act upon, emails alerting them to the possibility of fraud. Based on the twin developments of December 12, 2014, the Company's ADRs plummeted an additional 4%, sinking to a new 52-week low.

138. On December 15, 2014, Brazilian prosecutors announced that they had filed criminal charges against another former Petrobras executive, along with 3 other individuals. Cervero was Petrobras' international director when it overpaid for the Pasadena refinery.

139. On December 23, 2014, the Company issued a press release stating that its Board of Directors had approved the formation of a special committee that would serve as a reporting liaison with the independent investigation firms retained, Trench, Rossi e Watanabe and Gibson, Dunn & Crutcher.

140. On January 27, 2015, Petrobras released its unaudited third quarter financial statements. PWC did not sign off on the statements and, despite the representations made by both Foster and Barbassa during the November conference call with investors, the reported results failed to include any PP&E write-downs.

141. The January 27, 2015 financial results, for the first time, noted the potential scale of the scandal. It stated that:

> The information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 (the period during which the scheme operated, as stated in the depositions [of Costa and Youssef] with the suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people. The Company is not aware of material evidence of any misconduct relating to other contracts entered into during the same period or to other contracts entered into during other periods.

142. In admitting that the scope of Lava Jato was at least eight years, and implicating everyone from contractors through Petrobras employees and government agents, Petrobras acknowledged a greater problem than it had previously been willing to accept. In fact, it stated that approximately "R$188.4 billion of the Company's property, plant and equipment", corresponding to 52 assets under construction or in operation, or <u>*almost one third of Petrobras'*</u>

*consolidated property, plant and equipment* were linked to contracts for the supplying of goods and services between Petrobras and Cartel companies.

143. Petrobras further admitted that the consolidated interim financial statements released on January 27, 2015 did not conform with accepted accounting standards because of the problems related to the scandal. The Company estimated that the net write-down could be R$61.4 billion, based upon R$88.9 billion in asset overvaluations and just R$27.2 billion in undervalued assets. However, Petrobras refused to incorporate its estimate into the financial results, claiming that doing so "would include elements with no direct relation with the unlawful payments" and that it would "examine another methodology that takes into account values, deadlines and information from the 'Operation Lava Jato' testimonials."

144. These disclosures again caused a noticeable drop in the Company's stock price, causing its ADRs to fall 12% between January 27 and 28, 2015.

145. In the days following the release of the limited third quarter financial results, both Moody's and Fitch downgraded Petrobras' bonds, with Moody's cautioning that its rating remained under review for a further downgrade. On February 24, 2015, Moody's indeed followed through on it warning and downgraded the Company's status to junk.

146. On March 8, 2015, various news reports provided additional background and details regarding the scandal, including further insight into the machinations of the actual bribe delivery scheme, causing the stock price of the ADRs to decline over 6%.

147. The following day, the Wall Street Journal reported that Pedro Barusco, a former Petrobras executive, admitted that he amassed a staggering total in bribes, nearly $100 million over several years. He stated that he first began taking bribes in 1997 or 1998, and in speaking publicly for the first time on the subject, estimated that the Worker's Party may have collected

between $150 million and $200 million. Barusco admitted to meeting with Joao Vaccari Netto, treasurer for the Worker's Party, in hotels and restaurants to discuss the kickback scheme and how best to share bribes. As part of Barusco's plea agreement with prosecutors, he agreed to repatriate $100 million held in overseas bank accounts, which he acknowledged was largely generated from the acceptance of bribes. Based on this newly disclosed information, Petrobras' ADRs dropped more than 5%.

148. On April 23, 2015, Petrobras released its long delayed audited financial statements for 2014. It estimated its losses due to corruption as R$6.2 billion ($2.5 billion) and took a R$44.6 billion ($14.7 billion) impairment charge. The statements were released without qualification by PWC. It also announced that it was not going to pay a dividend in 2015.

149. Petrobras stated that the bribes were pervasive and that the Company estimated it overpaid by at least 3% on every contract between 2004 and April 2012:

> Petrobras believes that this methodology produces the best estimate for the aggregate overstatement of its property, plant and equipment resulting from the payment scheme, in the sense that it represents the upper bound of the range of reasonable estimates. The estimate assumes that all contracts with the identified counterparties were affected and that 3% represents the amount by which the Company overpaid on those contracts. Both assumptions are supported by the testimony, even though some testimony indicated lower percentages with respect to certain contracts, a shorter period (2006 to 2011), or fewer contractors involved.

150. In the April 23, 2015 financial statements and accompanying documents and filings, the Company admitted that:

> According to the information available to the Company described above, under the payment scheme, a large number of contractors and suppliers colluded with the former Petrobras personnel to overcharge Petrobras under construction contracts and contracts to provide Petrobras with goods and services, and used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or the former Petrobras personnel.

* * *

> In addition to the payment scheme, the investigation identified several other specific instances in which Petrobras was overcharged in connection with the acquisition of [PP&E]. The amount that Petrobras was overcharged was used to make unrelated payments to Petrobras personnel.
>
> * * *
>
> [R]ecords reflect the terms of the contract entered into by the Company, which entailed payments that were inflated because of the conspiracy among the cartel members and the former Petrobras personnel to overcharge Petrobras.

151. The Company went on to admit that its accounting for the bribes violated applicable accounting standards:

> As previously mentioned, Petrobras believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical cost of the property, plant and equipment. Therefore, under Brazilian tax legislation, this write-off is considered a loss resulting from unlawful activity and subject to the evolution of the investigations in order to establish the actual extent of the losses before they can be deducted from an income tax perspective.
>
> * * *
>
> The Company included in its historical cost for property, plant and equipment all of the amounts paid under the affected contracts. However, the Company believes that the amount of its contract payments representing overpayments to contractors and suppliers pursuant to the payment scheme should not have been capitalized as property, plant and equipment.
>
> * * *
>
> Based on the available information described above, the Company concluded that the portion of the costs incurred to build its property, plant and equipment that resulted from contractors and suppliers in the cartel overcharging the Company to make improper payments should not have been capitalized.

152. On May 26, 2015, Bloomberg reported that Cervero had been sentenced up to five years in prison as a result of his role in the Car Wash scandal. The same day, a Brazilian report emerged stating that former vice president of Cartel member Camargo Correa Hermelino Eduardo Leite confirmed that contractors met in order to normalize their bids, and stated that a

former director and president of Camargo Correa personally introduced him to the workings of the Cartel.

153. On July 2, 2015, the Financial Times reported that Petrobras' official estimates for losses it had suffered due to the corruption were too low, with one prosecutor stating that "We have no doubt that the losses are significantly larger than the R$6 billion that was announced."

154. Additional information and developments regarding the Petrobras fraud continues to be uncovered and disclosed. On March 8, 2016, Marcelo Odebrecht, former CEO of Odebrecht SA, one of the members of the Cartel, was sentenced to 19 years in prison for his role in the scandal, following his conviction on charges of money laundering, corruption and organized crime.

## VI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

155. Plaintiff intends to rely, in part, upon the presumption of reliance established by the fraud on the market doctrine. This doctrine is applicable because at all relevant times, the market for the Petrobras' ADRs purchased by Plaintiff was an efficient market for the following reasons, among others:

(a) Petrobras' ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

(b) Before and during the Relevant Period, Petrobras' securities were actively traded on both the NYSE and the Bovespa, demonstrating a very strong presumption of an efficient market;

(c) As a regulated issuer, Petrobras filed with the SEC periodic public reports before and during the Relevant Period, including information on behalf of its subsidiaries;

(d) Petrobras regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases and other wide-ranging public disclosures;

(e) Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms before and during the Relevant Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about Petrobras was rapidly reflected in and incorporated into the Company's stock price before and during the Relevant Period.

156. As a result of the foregoing, the market for Petrobras' securities promptly digested current information regarding Petrobras from all publicly available sources and reflected such information in Petrobras' securities price. Under these circumstances, Plaintiff suffered significant injury through his purchase of Petrobras' ADRs during the Relevant Period at artificially inflated prices, and a presumption of reliance applies.

157. A presumption of reliance is also applicable under long-standing Supreme Court precedent, set forth in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). *Affiliated Ute* applies where a plaintiff's claims, as here, are based in substantial part upon a defendant's material omissions such as those perpetrated by Petrobras. This action involves Petrobras' failure to disclose material adverse information regarding its own actions and material events affecting it, and thus positive proof of reliance is not a prerequisite to Plaintiff's recovery. For the majority of the allegations contained herein, Plaintiff will only be required to show that the facts withheld would have been material to a reasonable investor making investment decisions.

Given the clear importance of the misstatements and omissions set forth herein, this requirement has been satisfied.

## VII. LOSS CAUSATION / ECONOMIC LOSS

158. During the Relevant Period, as detailed herein, Petrobras engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's ADRs. As detailed above, when the truth about Petrobras' misconduct and its lack of operational and financial controls was revealed, the Company's ADRs declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Petrobras' ADRs was a direct result of the nature and extent of the fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff, was a direct result of the fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's ADRs when Petrobras' prior misrepresentations and other fraudulent conduct was revealed.

159. At all relevant times, Defendants' actions alleged herein directly or proximately caused the damages suffered by Plaintiff. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Petrobras' business, operations and financial condition, as alleged herein. Throughout the Relevant Period, Petrobras publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Petrobras' ADRs to be artificially inflated. Plaintiff also relied directly and indirectly on the negligent auditing practices of PWC.

Plaintiff purchased Petrobras' ADRs at those artificially inflated prices, causing him to suffer the damages complained of herein.

## VIII. NO SAFE HARBOR

46. The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false and misleading statements plead in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements plead herein, Petrobras' is liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false, misleading or omitted necessary information when they were made.

## COUNT I
**(Against Petrobras)**
**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

46. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47. This Count is asserted against Petrobras and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

48. Before and during the Relevant Period, Petrobras knowingly or with gross recklessness engaged in acts, transactions, practices and course of business which operated as fraud and deceit upon Plaintiff, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff. The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce Plaintiff to purchase Petrobras' ADRs during the Relevant Period at artificially inflated prices.

49. As a result of the failure to disclose material facts, the information Petrobras disseminated to the investing public was materially false and misleading as set forth above, and the market price of Petrobras' securities was artificially inflated during the Relevant Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by Petrobras, Plaintiff relied, to his detriment, on the integrity of the market price of Petrobras' securities in purchasing his shares. Had Plaintiff known the truth, he would not have purchased said shares or would not have purchased them at the inflated prices paid.

50. Plaintiff has suffered substantial damages as a result of the unlawful conduct alleged herein in an amount to be proved at trial.

51. By reason of the foregoing, Petrobras directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it: (a) employed devices, schemes and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts,

practices and a course of business which operated as a fraud and deceit upon Plaintiff in connection with his purchases of Petrobras' securities during the Relevant Period.

**COUNT II**
**(Against all Defendants)**
**Common Law Negligent Misrepresentation**

52. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein. This count specifically excludes any allegation that PWC acted with scienter or intent.

53. Defendants made material misrepresentations, including, without limitation, those representations and omissions as to the financial results of Petrobras. These material misrepresentations and omissions were contained in and incorporated into the Company's SEC filings, as well as press releases, financial statements and other disclosures made by Petrobras.

54. These misrepresentations were false in that, among other reasons, the Company's financial statements were not prepared in accordance with GAAP and/or IFRS. Further, the Company had inadequate internal controls which if adequate as represented would have ensured compliance with GAAP and IFRS and which would have prevented the illegal kickback scheme alleged herein.

55. With respect to PWC, it is in the business of auditing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use.

56. As the independent auditor of Petrobras, PWC had a duty to examine the financial statements of Petrobras to determine, among other things, whether they were fairly presented and in accordance with GAAP and/or IFRS.

57. PWC knew and intended that its reports concerning Petrobras' financial statements would be disseminated to prospective purchasers of Petrobras' securities, including ADRs, and that such purchasers would rely and had a right to rely, upon the information provided therein concerning the financial condition of Petrobras in making their investment decisions. PWC knew and intended that its audit opinions and the annual financial statements of Petrobras to which they related would be included in Petrobras' financial statements and would be further incorporated by reference in and constituted a material part of the Company's SEC filings, and PWC expressly consented to such inclusion and incorporation.

58. PWC was negligent as to the falsity of Petrobras' representations and were further negligent as to the omission of material facts from Petrobras' SEC filings.

59. At the time of the misrepresentations and omissions of material facts by the Defendants, Plaintiff and his agents were ignorant of their false and misleading nature and believed them to be true. If Plaintiff and/or his agents had been aware of the true facts, he would not have purchased or continued to hold Petrobras ADRs.

60. To the extent available, Plaintiff relies upon the presumption of reliance as regards this count. To the extent Plaintiff's direct reliance is applicable to this claim, Plaintiff and/or his agents reasonably relied on Defendants' omissions and misstatements. Plaintiff and/or his agents were not aware of the omissions and misstatements described above when he acquired Petrobras ADRs and he could not, even with the exercise of reasonable diligence, have become aware of the actual facts. Plaintiff and/or his agents relied upon, among other things, statements made by or authorized by Defendants in the Company's SEC filings and other public statements described herein.

61. Defendants' conduct constitutes negligent misrepresentations, including negligent omissions to state facts in connection with statements actually made.

62. As a direct and proximate result of the negligent misrepresentations and omissions by Defendants, and in reliance thereon, Plaintiff suffered damages in connection with his investments in Petrobras ADRs.

**COUNT III**
**(Against Petrobras)**
**Common Law Fraud**

63. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

64. As described herein, Petrobras is liable to Plaintiff for damages because it committed common law fraud by intentionally supplying materially false information to Plaintiff, concealing material facts it had a duty to disclose, and intending that Plaintiff would rely on such false information and purchase the Company's ADRs.

65. The false statements and omissions detailed in the Company's financial statements, its website and in other written and oral presentations were material in that they related to matters that would have been of importance or held significance in Plaintiff's decision whether to purchase the ADRs. Further, Plaintiff would have viewed the disclosure of the true facts as having significantly altered the total mix of information available.

66. At the time he acquired the ADRs, Plaintiff was not aware of the materially false statements and/or omissions detailed herein.

67. Petrobras made the materially false statements and omissions detailed herein with knowledge of their falsity at the time they were made, or at least with gross recklessness, and with the intent that Plaintiff rely on such representations and misrepresentations.

68. Plaintiff actually, reasonably and justifiably relied to his detriment on Petrobras' material misrepresentations and omissions in purchasing the ADRs and that reliance caused the harm to him for which he seeks to redress in this lawsuit. Had Plaintiff known the truth, he would not have purchased the ADRs or would not have purchased them for the price paid.

69. Plaintiff has been severely damaged as a direct and proximate result of Petrobras' fraud. Plaintiff is entitled to recover from Petrobras all of the damages he sustained as a result of its fraud. In addition, due to the nature of Petrobras' conduct, Plaintiff is entitled to recover exemplary damages.

## COUNT IV
## (Against Petrobras and PWC)
## Common Law Unjust Enrichment

70. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein. This count specifically excludes any allegation that PWC acted with scienter or intent.

71. Defendants Petrobras and PWC wrongfully benefited from and were enriched by their roles in the kickback scheme by receiving compensation, payment or fees for their services and Defendants appreciated or had knowledge of such benefits.

72. The wrongful benefit and enrichment of Petrobras and PWC occurred at the expense of Plaintiff.

73. Because the retention by Petrobras and PWC of these benefits and enrichment would be unjust, Plaintiff is entitled to collect from them the benefits and enrichment each received in connection with their services.

**COUNT V**
**(Against PWC)**
**Professional Negligence**

74. Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein. This count specifically excludes any allegation that PWC acted with scienter or fraudulent intent.

75. PWC owed Petrobras and its investors a duty to perform its audits and professional services in accordance with the professional standards governing accountants and auditors. PWC breached its duty by doing or failing to do, among others, the following:

i) Failing to verify the integrity and competitiveness of the bidding process for certain important Petrobras' capital projects;

ii) Failing to detect the price inflation in a significant portion of Petrobras' contracts, to the total of in excess of $80 billion improperly and falsely booked as assets according to PP&E;

iii) Consistently and repeatedly certifying before and during the Relevant Period that Petrobras had adequate internal controls free of material weakness;

iv) Failing to investigate in connection with Abreu and Comperj despite being alerted to the existence of probably wrongdoing by massive cost overruns and delays, reports by Brazil's TCU identifying irregularities in the refinery projects and reports from whistleblowers;

v) Failing to consider the significant increase in the risk of fraud with relation to Abreu and Comperj in light of such red flags and the significance of those projects to the Company's PP&E, which accounted for up to 70% of Petrobras' total booked assets during the Relevant Period;

vi) Failing to employ appropriate audit procedures for the Petrobras account;

vii) Failing to require sufficiently persuasive evidence to support its conclusions and Petrobras' material accounting and financial estimates and representations;

viii) Failing to corroborate management's explanations and representations concerning the reasons for the cost overruns and delays endemic in the Company' major capital investments.

76. Each of these failures violated one or more of the following applicable professional standards, among others:

i. AU 230 Due Professional Care in the Performance of Work;
ii. AU 312 Audit Risk and Materiality in Conducting an Audit;
iii. AU 316 Consideration of Fraud in a Financial Statement Audit;
iv. AU 317 Illegal Acts by Clients
v. AU 326 Evidential Matter
vi. AU 330 The Confirmation Process
vii. AU 410 Adherence to Generally Accepted Accounting Principles
viii. AS No. 5 An Audit of Internal Control Over Financial Reporting that is Integrated with an Audit of Financial Statements

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a) Awarding compensatory damages in favor of Plaintiff against Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(b) Award punitive damages in favor of Plaintiff against Petrobras for the damages sustained as a result of its wrongdoings, with interest thereon;

(c) Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d) Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: April 11, 2016

By:

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**

*/s/ D. Greg Blankinship*
D. Greg Blankinship
1311 Mamaroneck Avenue, Suite 220
White Plains, New York 10605
Tel: (914) 298-3281
Fax: (914) 824-1561
*gblankinship@fbfglaw.com*

**BLOCK & LEVITON LLP**
Jason M. Leviton
Steven P. Harte
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Jason@blcokesq.com
Steven@blockesq.com

*Attorneys for Plaintiff*